## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **LATHENIA JOY BAKER,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:20-cv-00283-TES** |
| **UPSON REGIONAL MEDICAL CENTER,** | |
| *Defendant.* | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff, Dr. LeThenia Joy Baker, brings this action against her former employer, Defendant Upson Regional Medical Center, for alleged employment discrimination with respect to her pay under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Equal Pay Act, 29 U.S.C. § 206. *See generally* [Doc. 1]. With the benefit of discovery, Defendant moved for summary judgment as to both claims. *See* [Doc. 24]. Having reviewed the evidence presented by the parties and their respective arguments, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 24].

## FACTUAL BACKGROUND

Plaintiff started medical school at Morehouse School of Medicine in July of 2005 and graduated in May of 2009. [Doc. 35-1, ¶ 1]. Plaintiff completed her residency at Morehouse School of Medicine and Grady Health System in Atlanta. [*Id.* at ¶ 7].

Following her residency, Plaintiff worked at St. Francis Hospital in Columbus, Georgia for 18 months and earned a base salary of $200,000. [Doc. 28, Baker Depo., p. 33:18–19]. After being laid off by St. Francis, Plaintiff began working at Upson Regional Medical Center in March 2015. [*Id.* at ¶ 2]; [Doc. 28, Baker Depo., p. 34:20–22]. At the start of her full-time employment with Defendant, Plaintiff had two and a half years of practice as a physician and did not have any certifications or fellowships. [*Id.* at ¶¶ 3, 5]; [Doc. 28, Baker Depo., p. 64:4–9]. Plaintiff would later attain certifications in electronic fetal monitoring and perinatal mental health, and a fellowship for transformational health leadership while working for Defendant. [Doc. 35-1, ¶ 4]; [Doc. 28, Baker Depo., pp. 17:12–14]. Plaintiff became board certified in 2016 after beginning her employment with Defendant. [Doc. 28, Baker Depo., p. 18:15–18].

Prior to joining the staff as a full-time physician, Plaintiff directly contracted with Defendant to work as a locum tenens[1] from March 2015 to June 2015. [Doc. 35-1, ¶ 8]. Plaintiff proposed, and Defendant accepted, a rate of $1,200 per 24-hour call period for her work as a locum tenens. [*Id.* at ¶¶ 8, 10]. Defendant also employed Drs. Nicholas Psomiadis, Perry Wells, and Hugh Smith as locum tenens physicians during Plaintiff's employment. [*Id.* at ¶¶ 11–13]. Dr. Psomiadis worked for a third party who determined his rate of pay. [*Id.* at ¶ 11]. Dr. Wells contracted directly with Defendant and earned a

---

[1] Physicians or providers who work under locum tenens contracts assist hospitals with calls or hospital coverage on a temporary basis. [Doc. 35-1, ¶ 9].

rate of $2,800 per 24-hour call period in order to subsidize his increase in premiums for his medical malpractice coverage. [*Id.* at ¶ 12]; [Doc. 26, Thompson Depo., p. 103:5–22]. Dr. Smith also directly contracted with Defendant and earned a rate of $898 per 24-hour call period. [Doc. 35-1, ¶ 13]; [Doc. 26, Thompson Depo., p. 106:7–16].

On June 15, 2015, the parties executed an employment contract for Plaintiff to work for Defendant as a full-time physician. [Doc. 35-1, ¶ 13]. Plaintiff retained counsel, Arden Miller, to represent her during contract negotiations with Defendant. [*Id.* at ¶ 24]. According to Plaintiff, Ms. Miller's legal practice exclusively focuses on physician contracts so that she handles nothing else. [Doc. 35-1, ¶¶ 78, 79]; [Doc. 28, Baker Depo., p. 110:10–17]. The parties negotiated at least some of the substantive terms of Plaintiff's initial contract and Plaintiff proposed changes to the original draft. [Doc. 35-1, ¶ 25]; [Doc. 28, Baker Depo., pp. 55:2—56:8]. These negotiations took place between Plaintiff, her attorney, Ronald Barfield (Defendant's attorney), and Defendant's then-CEO, David Castleberry. [Doc. 26, Thompson Depo., p. 28:18—29:8].[2]

---

[2] Plaintiff attempts to dispute this statement by saying "Thompson testified that she did not take part in the negotiations, but she believed they took place among the listed individuals." [Doc. 35-1, ¶ 26]. However, the clear testimony of Jennifer Thompson (Defendant's designated 30(b)(6) representative) reflects that negotiations did take place between these parties. Further, Plaintiff failed to cite to a particular portion of the record allegedly controverting this fact, and under Local Rule 56 it is deemed admitted. *See* LR 56, MDGa ("All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.").

Plaintiff's initial full-time employment agreement contained a five-year term and an initial base salary of $260,000 with $5,000 increases each year ending with $280,000 in the fifth year. [Doc. 35-1, ¶ 14]; [Doc. 28-1, p. 9]. Plaintiff's contract also provided her with up to $10,000 for moving expenses, a $20,000 sign on bonus, and $20,000 per contract year for student loan reimbursement up to $100,000. [Doc. 35-1, ¶ 23]; [Doc. 28-1, p. 14]. Defendant initially offered Plaintiff a base salary of $250,000, but Plaintiff successfully negotiated the amount to $260,000. [*Id.* at ¶ 27]. Plaintiff's salary was agreed upon between Defendant's attorney, Ronald Barfield, and Plaintiff's attorney, Arden Miller. [Doc. 26, Thompson Depo., p. 39:2-11].[3]

In part, Defendant relied on information from the available Medical Group Management Practices Association ("MGMA") data to set Plaintiff's base compensation. [Doc. 26, Thompson Depo., pp. 29:1–13; 30:1–25].[4] With respect to base salary, the

---

[3] In her Response to Defendant's Statement of Material Facts, Plaintiff denies this fact. [Doc. 35-1, ¶ 28]. Her basis for denial is the fact that Jennifer Thompson stated she "believed the fact to be true." [*Id.*]. The Court finds this to be a distinction without a difference. Further, Plaintiff's attempts to attack the record due to possible gaps in Ms. Thompson's personal memory lack merit. Defendant designated Ms. Thompson to testify on its behalf pursuant to Federal Rule of Civil Procedure 30(b)(6). As such, Ms. Thompson did not testify as to her personal knowledge, but to the knowledge of the organization. Even if she did not have personal knowledge of the negotiations of Plaintiff's contract, so long as the organization had such knowledge then Ms. Thompson's testimony sufficiently establishes this as a fact in the record. Regardless, the Court doesn't find this fact to be material so as to justify a trial.

[4] Again, Plaintiff denies this statement of fact on the basis that Jennifer Thompson "did not specifically remember pulling the data, but *she believed* she likely pulled the MGMA data as one of her job duties." [Doc. 35-1, ¶ 16]. Indeed, it is true that Ms. Thompson testified "[she] [didn't] remember pulling it, but that was part of my responsibility. So I would assume that I was the one who pulled that information." [Doc. 26, Thompson Depo., p. 31:8–12]. The Court notes that Ms. Thompson's statement does not negate that the MGMA data was pulled, but only calls into question who actually pulled it. Again, Ms. Thompson testified on behalf of the organization. Again, this sort of factual dispute just isn't so material as to require a trial.

4

MGMA data can be filtered by specialty, geographic region, years of specialty, years of experience, and can show different percentiles of pay based on these metrics. [Doc. 35-1, ¶ 18]; [Doc. 26, Thompson Depo., p. 30:6–24]. Defendant tried to stay around the 25th percentile of MGMA data when setting salaries, and Plaintiff's base salary of $260,000 reflected the 25th percentile of salaries for physicians with similar limited experience and no board certification. [Doc. 35-1, ¶ 15]; [Doc. 26, Thompson Depo., p. 40:11–22]. Dr. Psomiadis' $305,000 salary also approximated the 25th percentile of MGMA data for physicians with his similar level of experience and credentials. [Doc. 35-1, ¶ 22]; [Doc. 26, Thompson Depo., pp. 43:8–10; 72:25—73:1].

In addition to her base salary, signing bonus, moving expenses, and student loan reimbursement, Plaintiff's contract also provided her with the ability to earn incentive compensation based on her wRVU[5] levels. [Doc. 35-1, ¶ 32]; [Doc. 28-1, p. 10]. To clarify, a wRVU is a points assignment relating to a particular procedure or service performed by a physician and set by the Centers for Medicare and Medicaid Services. [Doc. 26, Thompson Depo., p. 46:1–12]; [Doc. 28, Baker Depo., p. 24:2–13]. Per Plaintiff's initial employment contract, "[p]hysician[s] may receive credit for a wRVU so long as [Defendant] may legally bill and collect for the Physician's services in accordance with

---

[5] A wRVU is a "working relative value unit." [Doc. 28, Baker Depo., p. 24:5–11].

applicable laws, regulations, and contractual terms, whether or not [Defendant] actually bills or collects for those services." [Doc. 28-1, p. 18].

Plaintiff's initial employment contract specified a tiered structure for her possible bonus incentive compensation. [Doc. 28-1, p. 10]. The bonus structure contained three tiers: Plaintiff would be paid $5 for every wRVU above 6,548 but below 7,203; $10 for every wRVU above 7,203 but below 7,923; and $20 for every wRVU in excess of 7,923. [Doc. 28-1, p. 10]. The parties' respective attorneys negotiated these corresponding levels and David Castleberry approved them. [Doc. 26, Thompson Depo., p. 47:1–9].[6] Defendant structured Plaintiff's bonus compensation in this tiered manner to allow her the ability to ramp up her practice as a new OBGYN, allowing her to earn additional bonus compensation at a lower threshold. [Doc. 26, Thompson Depo., p. 47:13–23]; [Doc. 28-2, p. 4].[7]

Dr. Psomiadis started working for Defendant as a full-time physician in August of 2015. [Doc. 35-1, ¶ 43]. At the time he started working for Defendant, Dr. Psomiadis

---

[6] In her Response, Plaintiff failed to specify a portion of the record to controvert this fact, so it is deemed admitted under Local Rule 56.

[7] Plaintiff's attempt to deny and controvert this statement of fact falls flat. Her response focuses on how Ms. Thompson was unable to recall how Dr. Psomiadis' structure was set "[w]hen pressed for specifics about what factored into the decision to structure the male physician's bonus compensation so differently that [sic] the female physician's." [Doc. 35-1, ¶ 40 (citing Doc. 26, Thompson Depo., pp. 75:22—76:15)]. However, that portion of the record does not shed any light as to Defendant's reasoning with respect to Plaintiff's bonus structure. Instead, that portion (and the immediately preceding and subsequent testimony) only discusses how Defendant set Dr. Psomiadis' bonus structure.

had been in practice between 15 and 17 years,[8] had never had a fetal demise, and had

never been sued. [Doc. 26, Thompson Depo., p. 74:6–9]; [Doc. 28, Baker Depo., pp.

64:10—65:4]. Defendant had hired Dr. Psomiadis with the expectation that he would

serve as Plaintiff's mentor. [Doc. 26, Thompson Depo., pp. 74:21—75:8].[9] Dr. Psomiadis

was board certified at the time he began working for Defendant. [Doc. 26, Thompson

Depo., p. 75:3–5].

Despite the varying years of experience between the two physicians, Plaintiff

believes she had more practical experience than Dr. Psomiadis because she came from

all high-volume centers, had more cases, and had delivered more babies. [Doc. 35-1,

¶52]; [Doc. 28, Baker Depo., pp. 74:4–7, 81:7–10]. Plaintiff also believed she was working

harder than Dr. Psomiadis during their overlapped tenure. [Doc. 35-1, ¶ 56]; [Doc. 28,

Baker Depo., p. 86:22]. While employed by Defendant, Plaintiff limited the number of

patients she would see in a day to 28 and is sure that on occasion Dr. Psomiadis saw

---

[8] The record isn't clear as to how long Dr. Psomiadis had been practicing. Plaintiff testified that she was told he had been in practice for 15 years and Ms. Thompson testified that he had been in practice for 17 years. *See* [Doc. 26, Thompson Depo., p. 74:6–9]; [Doc. 28, Baker Depo., pp. 64:10—65:4]. However, the exact number of years seems to not matter as Ms. Thompson testified that the MGMA experience criterion used for Dr. Psomiadis was "the 25th percentile for 13 to 17 years." [Doc. 26, Thompson Depo., p. 74:10–12].

[9] Again, Plaintiff's attempt to deny and controvert this statement fails. Plaintiff denies this fact on the basis that Ms. Thompson "did not testify that she had personal knowledge of the referenced facts." [Doc. 35-1, ¶ 45 (citing [Doc. 26, Thompson Depo., p. 75:9–12]). The cited portion of the record does not establish that Ms. Thompson lacked any personal knowledge, rather it establishes that she did not personally set Dr. Psomiadis' bonus structure. However, even if the record did reflect this proposition, as the Court has noted, Ms. Thompson doesn't need to have personal knowledge so long as she is testifying to the organization's knowledge.

more patients than her. [Doc. 35-1, ¶ 57]; [Doc. 28, Baker Depo., p. 72:12–19]. Plaintiff also admitted that Dr. Psomiadis produced more wRVUs than her, which is why she tried to stay on a tiered bonus structure rather than an identical structure to Dr. Psomiadis. [Doc. 28-2, pp. 5–6].

Plaintiff first approached Defendant regarding her alleged disparate bonus structure by sending Jeff Kirkpatrick and Tripp Penn an email on September 15, 2017. [Doc. 28-2, p. 1]; [Doc. 35-1, ¶ 59]. In her email, Plaintiff stated she believed her wRVU Incentive Compensation rate was lower than most other surgical subspecialists. [Doc. 28-2, p. 1]. Mr. Penn later responded to Plaintiff saying "[he's] not a fan of comparing contracts because everyone's situation is different and each negotiation is different based on that particular point in time, that individual's credentials and the needs of the community and the health system at that point in time." [Doc. 28-2, p. 4]. However, Mr. Penn and Mr. Kirkpatrick told Plaintiff they would look into her pay concerns and met with her to discuss them. [Doc. 35-1, ¶¶ 63, 64]; [Doc. 28-5, p. 1]. Defendant started working on Plaintiff's contract amendment as early as December 1, 2017. [Doc. 28-5, p. 1].

Plaintiff again retained Arden Miller to assist her in negotiating her proposed contract amendment. [Doc. 35-1, ¶ 81]; [Doc. 28, Baker Depo., pp. 110:24—111:2]; [Doc. 28-6]. On January 2, 2018, Plaintiff sent an email to Tammy Moore and Tripp Penn inquiring as to why there were differences with her final submission and the executed

amendment. [Doc. 35-1, ¶ 83]; [Doc. 28, Baker Depo., p. 115:3–17]; *see* [Doc. 28-6]. Then, on February 13, 2018, Plaintiff emailed Phil Geissinger expressing concerns about the delay in executing her contract amendment. [Doc. 28-8, pp. 1–2]. In response, Mr. Geissinger addressed Plaintiff's concerns and agreed to nearly all of her requests. [Doc. 35-1, ¶ 90]. Plaintiff finally executed the amendment to her employment agreement on August 23, 2018. [Doc. 35-1, ¶ 91]; [Doc. 28-9, p. 7]. Plaintiff's bonus incentive compensation structure was changed to mirror Dr. Psomiadis' and entitled Plaintiff to $40 for each wRVU over 3990 for each half of the year. [Doc. 35-1, ¶ 93]; [Doc. 28-9, p. 5].

Plaintiff eventually filed her EEOC Charge on November 18, 2019 and indicated that she believed Defendant had discriminated against her because of her race and sex, in other words, because she was a black female. [Doc. 35-1, ¶ 106]; [Doc. 28-10, p. 1]. In her EEOC Charge, Plaintiff asserted that she "was never compensated at an equitable rate when compared to the white male colleague despite repeated documentation that [she] provided more services, worked more hours, and consistently had equal or better outcomes.". [Doc. 28-10, p. 2]. Plaintiff further alleged that she "believe[s] that [she] [has] been discriminated against based on [her] sex (female), and race (African American), in violation of Title VII of the Civil Rights Act of 1964, as amended." [Doc. 28-10, p. 2]. The EEOC issued Plaintiff a Notice of Right to Sue [Doc. 28-11, p. 1] on April 17, 2020.

## DISCUSSION

### A.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[10] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323).

---

[10] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact

all allegations the [nonmoving] party makes, provided they are
sufficiently supported by evidence of record. So[,] when competing
narratives emerge on key events, courts are not at liberty to pick which
side they think is more credible. Indeed, if "the only issue is one of
credibility," the issue is factual, and a court cannot grant summary
judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and
determine the truth of the matter but to determine whether there is a genuine issue for
trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and
all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable
jury could make more than one inference from the facts, and one of those permissible
inferences creates a genuine issue of material fact, a court cannot grant summary
judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at
1263.

### B.   <u>Upson Regional Medical Center's Motion for Summary Judgment</u>

In her Complaint, Plaintiff brings three separate claims against Defendant. First,
Plaintiff alleges that Defendant violated the Equal Pay Act ("EPA") 29 U.S.C. § 203(d)
by compensating her male counterpart "in excess of $300,000" more than her. [Doc. 1,
¶¶ 30–39]. Second, Plaintiff claims that Defendant discriminated against her due to her
sex by compensating Dr. Psomiadis more than her in violation of Title VII. [*Id.* at ¶¶ 40–
49]. Third, Plaintiff brings a similar claim under Title VII, alleging that Defendant
discriminated against her on the basis of her race. [*Id.* at ¶¶ 50–59]. To support these

claims, Plaintiff referenced disparate pay rates as a locum tenens, disparate base salary and disparate bonus compensation compared to Dr. Psomiadis. [*Id.* at ¶¶ 17–18, 20–22, 24].

In its Motion for Summary Judgment, Defendant addressed each of Plaintiff's claims, and each category of compensation—that is, her pay as a locum tenens, her base salary as a full-time employee, and her bonus compensation as a full-time employee. *See generally* [Doc. 24-2]. But, in her Response, Plaintiff only responded to some of the claims and categories referenced in Defendant's summary judgment motion. For example, Plaintiff specifically asserts "Defendant . . . is not entitled to summary judgment on [her] Equal Pay Act or Title VII *sex discrimination* claims." [Doc. 35, p. 1 (emphasis added)]. Further, Plaintiff argued "[Defendant] has not carried its heavy burden of showing that *sex or gender* was not a factor in its decision to pay Dr. Psomiadis twice as much *per wRVU than Dr. Baker for achieving similar threshold service provider goals*." [*Id.* at pp. 1–2 (emphasis added)]. Similarly, Plaintiff never mentioned her time or pay as a locum tenens, and only discusses her base salary in comparison to her bonus structure. *See* [Doc. 35, pp. 2, 3, 9].

Whenever a motion for summary judgment seeks dismissal of a specific claim, and the nonmovant fails to address it in the response, a district court can find the claim abandoned and properly grant summary judgment in favor of the moving party. *Mosley v. Ala. Unified Jud. Sys. Admin. Off. of Cts.*, 562 F. App'x 862, 866–67 (11th Cir. 2014)

13

(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). Given the Plaintiff's limited response to Defendant's Motion for Summary Judgment, the Court finds that Plaintiff abandoned her Title VII race discrimination claim and any EPA and Title VII sex discrimination claims other than disparate bonus compensation structure. Consequently, the Court **DISMISSES** Plaintiff's Title VII race discrimination claim and all claims related to her pay, except for her Title VII and EPA claims regarding her bonus pay.

### 1.    Plaintiff's Equal Pay Act Claim

Plaintiff argues that Defendant violated the EPA by providing Dr. Psomiadis a "more favorable bonus compensation plan and . . . more bonus compensation under that plan than she did even though she performed equal or . . . more work than [him]." [Doc. 35, p. 9]. Defendant argues that its decision to offer her a different bonus structure than Dr. Psomiadis was justified by a factor "other than sex"—the fourth affirmative defense provided by the statute. [Doc. 24-2, 12]. Further, Defendant argues that Plaintiff's claim is partially time-barred as a matter of law. [Doc. 24-2, p. 11]; [Doc. 36, p. 5]. The Court will first address the substantive (as opposed to the procedural) portions of Defendant's motion.

### a.    *Plaintiff has failed to show pretext.*

The EPA makes it unlawful to pay employees different wages because of their sex. Specifically, the statute provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1). However, the statute goes on to provide four affirmative defenses allowing differences in wages between employees of different sex. Only the fourth affirmative defense is relevant to this case, which provides that "a differential based on any other factor other than sex" can justify a difference in pay. *Id.*

To prove her *prima facie* case, Plaintiff must show that Defendant "pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Meeks v. Comput. Assocs. Intern.*, 15 F.3d 1013, 1018 (11th Cir. 1994) (quoting *Miranda v. B &B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992)) (cleaned up). Once a plaintiff establishes their *prima facie* case, the burden shifts to the defendant "to prove by a preponderance of the evidence that the pay differential was justified under one of the four affirmative defenses in section 206(d)." *Meeks*, 15 F.3d at 1018. This burden is heavy "because the defendants must show that the factor of sex provided *no basis* for the wage differential." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (citing *Muhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir.), *cert. denied*, 513 U.S. 919 (1994)). If the defendant overcomes the burden, "the plaintiff must rebut the

15

explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Irby*, 44 F.3d at 954 (citing *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991) (per curiam)). "If plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial." *Id.*

The fourth affirmative defense, "is a general exception to application of the EPA." *Id.* at 955 (quoting *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir.), *cert. denied*, 488 U.S. 948 (1988)). Although it is a general exception, defendants cannot "rely on a general practice but may consider factors such as the unique characteristics of the same job; an individual's experience, training or ability; or special exigent circumstances connected with the business." *Prewett v. Ala. Dep't of Veterans Affs.*, 533 F.Supp.2d 1160, 1176 (M.D. Ala. 2007) (quoting *Glenn*, 841 F.2d at 1571).

Neither party argues that Plaintiff failed to establish a *prima facie* case. The record clearly establishes that Dr. Psomiadis had a different bonus compensation structure, which resulted in more bonus compensation to him, and he performed a similar job that required equal skill, effort, and responsibility under similar working conditions. Instead, the parties focus on whether the evidence established in the record demonstrates that Defendant treated Dr. Psomiadis more favorably due to a factor other than sex.

Defendant argues that it has provided two reasons for offering Plaintiff a

different bonus structure: (1) offering Plaintiff a tiered compensation structure allowed her to ramp up her practice and earn bonuses at a lower threshold, which is desirable for a new physician starting their practice; and (2) the initial bonus structure was the result of contract negotiations between Plaintiff, her attorney, and Defendant. [Doc. 36, p. 6]. Surprisingly, Plaintiff argues that "[Defendant] . . . presented no evidence or justification for why Dr. Psomiadis was given the significantly higher bonus compensation structure." [Doc. 36, pp. 6–7]. The Court disagrees with Plaintiff.

Plaintiff's primary argument takes aim at Jennifer Thompson's deposition testimony. Indeed, Plaintiff explicitly argues that Defendant failed to meet its burden because it "relies instead on vague presumptions and half remembrances from a person who did not take part in the decision at issue." [Doc. 35, p. 10]. Plaintiff further asserts that Thompson "testified that she did not take part in the decision on how to structure either physician's wRVU bonus plan" but instead "testified about what she believed was done years ago because it was what was usually done and that she believed years of experience and the ability to 'ramp up' a practice was discussed when the plans were set." [*Id*.]. Last, Plaintiff states that Ms. Thompson "could not definitively say how or why the plans were set the way that they were" and that she did not recall how the structures were created. [*Id*.]. This last-ditch (but oft-repeated) effort to mischaracterize Ms. Thompson's testimony in hopes of surviving summary judgment fails.

Jennifer Thompson's deposition testimony affirmatively establishes that

Plaintiff's bonus structure resulted from negotiations between the parties and

Defendant provided a tiered structure specifically designed to allow her to ramp up in

her practice:

> Q:    Who is responsible for creating the graduating RVU bonus system that is
>       set forth in Dr. Baker's contract, little C section, double I, on URMC 00137?
>
> A:    That fee was negotiated between the attorneys. *I know the conversation
>       that was had regarding why they were graduated*. I didn't set the values.
>       *Those were set between Arden Miller and [Ronald] Barfield* and reviewed
>       by David [Castleberry].
>
> Q:    Did Mr. Castleberry have any input in the setting of these thresholds?
>
> A:    I believe he was just presented with these thresholding [sic], a review. We
>       discussed a graduated - - having these different buckets so to speak and
>       graduating that because *we were trying to give her the ability to ramp up
>       in her practice. Since she was so new to OB-GYN, she hadn't been in
>       practice very long, this would give her the ability to earn additional
>       compensation at a lower threshold while the practice grew.* We were in a
>       situation where we were in a totally rebuilding phase. So this kind of gave
>       her a bond to a lower threshold so that she could earn additional
>       compensation."

[Doc. 26, Thompson Depo., p. 47:1–23 (emphasis added)]. This testimony is far from

Plaintiff's characterization as "vague presumptions and half remembrances." Ms.

Thompson clearly testified that she knew the conversation that led to the setting of

Plaintiff's bonus structure and clearly indicated that she actively participated in it.

Indeed, not only does Ms. Thompson provide details as to why and how

Defendant set Plaintiff's compensation structure, she later offered similar details as to

how and why Dr. Psomiadis' bonus structure came about. At the risk of including too much testimony, the Court finds that the following portion of the deposition highlights Ms. Thompson's knowledge and further demonstrates Plaintiff's attempt to mischaracterize it:

Q:     And who made the decision to offer Dr. Psomiadis that wRVU based incentive compensation plan in 2015?

A:     That was negotiated between our attorneys which was Ronald Barfield and Dr. Psomiadis. He did not have representation at the time, so it basically was a collaboration between those two parties. I believe Dr. Psomiadis had came [sic] from a practice. I mean he's been in practice a long time. He'd been there a [sic] 17 years. The OB service had closed or was closing whenever he started working locum. And he was - - was 17 years experience and 17 years he'd never had a fetal demise and he had never had a lawsuit. So those were two factors that were pretty impressive.

                                                          . . .

Q:     Why was he offered a different wRVU incentive plan than Dr. Baker?

A:     Like I said earlier I believe Dr. Baker's RVU plan was created in order to allow her some ramp up period since she was a very new physician. Dr. Psomiadis bringing on that he had been in practice for so many years. It was a good base line for him already.
       He was - - you know, we - - at the time we hired him we felt as though he would be her mentor because he was so experienced and she of course only had 18 months and had been terminated from St. Frances [sic]. It was a - - we felt at the time was a good [sic] going to be a good relationship in order for a young physician just out of school just starting out to be mentored by someone with so much experience. He was board certified already and had been for years and years. Again, had [sic] had an excellent track record. So I believe that that factored in to the - - his RVUs there was a baseline of what he had produced in his prior practice.

Q:     You said you believed that factored in. You were not responsible for making that determination, were you?

A:      No, no. Not in conversation but not - -

Q:      And who specifically told you that his years of experience was going to result in him having a different wRVU compensation - - incentive compensation plan than Dr. Baker?

A:      That was a conversation with David Castleberry.

Q:      Where were you when that conversation took place?

A:      We would have been in his office.

Q:      And do you recall the specific conversation?

A:      I don't recall the specific words of the conversation. But it was - - that's how we did it from the - - that's how we established rates of pay. That's what we looked at in order to hire physicians.

Q:      I understand when you looked at MGMA to hire physicians. Right now I'm specifically talking about the wRVU. What did the hospital look at in making the determination that Dr. - - and I'm asking for your personal knowledge, not a guess or an assumption because that's the way you did things. I want to know what you personally know was considered when Dr. Psomiadis was offered the wRVU incentive plan or incentive compensation plan as reflected in his employment agreement?

A:      I don't know exactly. I'm [sic] just know a conversation that I know I recall from that many years ago. I know that we talked about that. I don't know how that number came about, but I know we talked about his years of experience and he talked about his track record being so good.

Q:      Who talked about his track record being so good?

A:      David Castleberry, myself, Ron Barfield.

Q:      So again, ultimately Mr. Castleberry would be the one who had to approve the RVU structure being offered to Dr. Psomiadis?

A:      Yes.

[Doc. 26, Thompson Depo., pp. 73:21—76:25].

This testimony unequivocally provides that Ms. Thompson did have knowledge as to how both physicians' bonus structures were set. Ms. Thompson only "wavered" when Plaintiff's counsel asked her to recall the specifics of a conversation that took place more than five years before her deposition. This simply does not controvert Ms. Thompson's testimony. Consequently, Plaintiff's efforts to create a triable issue of fact fail.

In fact, this idea that Plaintiff would need to start earning bonus compensation at a lower threshold than Dr. Psomiadis because she would likely produce less wRVUs is reflected in Plaintiff's emails to Defendant.  On September 25, 2017, during her second round of negotiations with Defendant, Plaintiff told Tripp Penn that "[she] like[d] the scaled RVU system because it gives [her] goals to shoot for" and that "[she] will not do quite as many RVUs as [Dr. Psomiadis]." [Doc. 28-2, pp. 4–5]. On September 28, 2017, Plaintiff told Jeff Kirkpatrick that "[she] would prefer to leave my bonus structure tiered" because she does not produce as many wRVUs as Dr. Psomiadis due to differences in volume of ultrasounds. [*Id.* at p. 6]. Further, Plaintiff admits that if she had been placed on Dr. Psomiadis' bonus structure that "[her] bonus would have actually been [lower]" in 2016. [*Id.*]. Last, Plaintiff told Mr. Kirkpatrick that because "[her] base salary is lower . . . [her] incentive should start at a lower threshold." [*Id.*].

Not only did the Defendant see the utility in providing a tiered structure to allow her to ramp up her practice, but Plaintiff did as well.

Eleventh Circuit precedent provides that an employer "may successfully raise the affirmative defense of 'any other factor other than sex' if [it] proves that [it] relied on prior salary *and* experience in setting a 'new' employee's salary." *Irby*, 44 F.3d at 955. In *Irby*, the Eleventh Circuit found that the use of prior salary and experience was sufficient to avoid liability. *Id.* at 955–56. While Ms. Thompson didn't testify that Defendant relied on Dr. Psomiadis' previous salary, she clearly testified that due to his commendable practice—including 15 more years of experience than Plaintiff, board certification, no fetal demises, and zero lawsuits over his career—that they thought his higher threshold and wRVU rate was a good baseline for his production. [Doc. 26, Thompson Depo., pp. 73:24—74:9, 74:17–20, 75:5–8].

Ultimately, the record provides that Defendants relied on multiple factors other than sex to set Plaintiff's bonus structure differently. It looked at the two physicians' differing levels of experience, their certifications (or in Plaintiff's case, lack thereof), their prior production, and it determined that this structure would allow Plaintiff to ramp up her new practice. Indeed, the fact that Defendant agreed to change Plaintiff's bonus structure after she initiated negotiations further weakens Plaintiff's claim. *Cf. Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1363 (11th Cir. 2018) ("Once Bowen established herself as an effective arbitration manager, prior salary and experience

22

would not seem to justify treating her different than the [comparator]."). Here, Plaintiff stressed the value she provided to the hospital, both in terms of her practice and her administrative work, during their negotiations to amend her contract. *See generally* [Doc. 28-2]. Defendant clearly agreed that she added enhanced value after ramping up her practice and acted accordingly by providing her the same bonus structure as Dr. Psomiadis. *See* [*Id.*].

Dr. Baker has not provided any evidence to indicate that Defendant set her bonus compensation plan lower than Dr. Psomiadis' because she is a woman. On the contrary, Defendant has provided uncontroverted evidence in the record that establishes it offered Dr. Psomiadis a different bonus structure based on factors other than sex such as his greater experience. The Court finds that this evidence satisfies its burden to rebut Plaintiff's *prima facie* case and that a reasonable jury could not disagree.

Consequently, the burden shifts back to Plaintiff to provide affirmative evidence showing that Defendant's explanation is pretextual or offered as a post-event justification for her EPA claim to survive summary judgment. *See Irby*, 44 F.3d at 954 (citing *Schwartz*, 954 F.2d at 623). But, Plaintiff focused her entire response as to the EPA on Defendant's alleged failure to provide evidence that it relied on factors "other than sex." She completely omitted any argument as to pretext. Thus, Plaintiff necessarily

failed to demonstrate that Defendant's offered explanation constitutes pretext or a justification after the fact. Accordingly, the Court **DISMISSES** her EPA claim.[11]

### 2.       Discriminatory Pay Under Title VII

Plaintiff also alleges that Defendant discriminated against her because of her sex in violation of Title VII. *See* [Doc. 1, pp. 8–10]; [Doc. 35, p. 11]. Defendant moves for summary judgment against this claim on two grounds: first, Plaintiff's claim is time-barred as a matter of law; and second, Plaintiff has not proven that sex played a motivating factor in setting her bonus structure. *See* [Doc. 24-2, p. 17]; [Doc. 36, pp. 4–5, 10]. Before reaching the merits of Plaintiff's claim, the Court discusses the procedural issue and finds that Plaintiff's claim is, in fact, time barred.

#### Plaintiff's Failure to Exhaust her Administrative Remedies

Defendant argues that Plaintiff's Title VII claim is entirely time-barred because she failed to timely file her EEOC charge, thus failing to exhaust her administrative remedies. The Court agrees. Further, as Defendant notes in its Reply, Plaintiff waived any objection to that argument. As such, she has effectively conceded that her claim is procedurally barred.

First things first. The Court notes that Defendant consistently maintained

---

[11] Because the Court finds that this offered explanation satisfies Defendant's burden, it doesn't need to address whether its second explanation—that the bonus structure was a result of negotiations during an arms' length transaction—does the same. Likewise, because the Court dismissed her EPA claims on substantive grounds, it need not address the Defendant's statute of limitations argument.

throughout its Motion that Plaintiff's EPA claim was also partially time-barred. *See* [Doc. 24-2, pp. 11, 12, 13, 15]. However, Defendant only raised the Title VII exhaustion issue in a single footnote in its Motion for Summary Judgment. *See* [*Id.* at p. 17 n.5]. But, Plaintiff did not address any time-bar arguments at all in her Response. Giving Plaintiff the benefit of the doubt, perhaps she thought that Defendant really wasn't seriously relying on this argument because it only mentioned it in a footnote. However, Defendant's Reply clearly addressed the issue of timeliness, erasing any doubt that it intended to thoroughly press that issue. *See* [Doc. 36, pp. 4–5]. If Plaintiff thought that Defendant had sandbagged her and had essentially taken away her chance to respond, she could have easily argued that Defendant only effectively raised the time-bar argument in its reply so that it was waived. But she didn't.

Moreover, Plaintiff also had the option of filing a motion asking the Court to allow her to file a surreply addressing the exhaustion issue under Local Rule 7.3.1. *See* MDGa LR 7.3.1(C) ("A party desiring to file a surreply brief must move in writing for permission to do so within fourteen (14) days of the filing of the brief to which reply is desired, succinctly specifying the reasons why additional briefing is necessary."). She didn't do that either.

Because Plaintiff failed to address the issue of exhaustion in her Response or a possible surreply, the Court finds that she abandoned any objection and concedes the

issue. However, the Court will nonetheless examine whether she failed to exhaust her administrative remedies.

In order to file an employment discrimination action under Title VII in federal court, the plaintiff must first file a charge with the EEOC, and then receive a right to sue letter. *See* 42 U.S.C. § 2000e-5(f)(1). Pursuant to Title VII, charges must be filed with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "If an employee fails to file an EEOC charge before the 180-day limitations period elapses, his or her subsequent lawsuit is procedurally barred and must be dismissed for failure to exhaust his or her administrative remedies." *Brewer v. Alabama*, 111 F. Supp.2d 1197, 1204 (M.D. Ala. 2000) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 256 (1980); *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1405, 1410 (11th Cir. 1998)).

Plaintiff filed her EEOC charge on November 18, 2019. [Doc. 35-1, ¶ 106]; [Doc. 28-10, p. 1]. In her Charge, Plaintiff asserted that she was being paid a lower incentive compensation rate than her white coworker.[12] [Doc. 28-10, pp. 1–2]. Thus, Defendant

---

[12] Plaintiff also makes a number of other complaints in her EEOC charge, but they are not relevant because the Court already determined she abandoned any Title VII claim other than her sex discrimination claim relating to her bonus compensation structure.

must have discriminated against Plaintiff with respect to her bonus compensation[13] on or after May 22, 2019 for this action to have been timely filed. The record clearly shows that Plaintiff failed to timely file her EEOC Charge.

The parties executed Plaintiff's full-time employee contract—the contract containing the allegedly discriminatory bonus structure—on June 15, 2015. [Doc. 35-1, ¶ 13]. The parties performed under that contract until they negotiated and executed her contract amendment on August 23, 2018. [Doc. 35-1, ¶ 91]. The contract amendment provided Plaintiff an identical bonus structure to Dr. Psomiadis. [*Id.*]. As such, *even if* the initial contract resulted from Defendant's discrimination, it ceased to discriminate against her on August 23, 2018, the day her bonus structure matched Dr. Psomiadis' bonus structure. Thus, Plaintiff had until February 18, 2019—180 days after August 22, 2018, the last day under the initial contract—to file her Charge of Discrimination with the EEOC. Instead, she waited until November 18, 2019, a total of 453 days—273 days

---

[13] The Court takes this opportunity to point out that how much Dr. Psomiadis actually made as his bonus is legally irrelevant. As the Court explains, the only remaining pay-related claim deals with an admittedly different bonus compensation structure. Plaintiff makes the argument that she and Dr. Psomiadis had differing bonus compensation structures, he made more than her and that, in and of itself, is discriminatory. However, this analysis misses the mark. For EPA and Title VII purposes, it really doesn't matter how much Dr. Psomiadis actually made under his bonus structure. Perhaps he performed more wRVUs than Plaintiff, or maybe he worked harder or was more efficient. The flaw in Plaintiff's direct comparison is that it necessarily assumes that she and Dr. Psomiadis performed the exact amount of wRVUs, something that is not found in the record. Again, we are talking about a bonus dependent on the amount of wRVUs that one performs, not a base salary. A more accurate and legally proper analysis from Plaintiff would have focused on the difference between what she made under her bonus structure and what she would have made under a structure similar to Dr. Psomiadis. Without this critical analysis, the differences between the differing bonus amounts really doesn't help the Court.

late.[14] Accordingly, Plaintiff failed to timely file her EEOC charge and as such her Title VII claim is procedurally barred and the Court **DISMISSES** it.[15]

## CONCLUSION

Based on all of the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 24] and **DIRECTS** the Clerk of Court to enter Judgment accordingly and **CLOSE** this case.

**SO ORDERED**, this 17th day of March, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

[14] Plaintiff argues that her contract amendment did not take effect until 2019 while Defendant maintains it took effect the day it was executed. *See* [Doc. 35, pp. 4–5]; [Doc. 36, p. 4]. Even giving Plaintiff the benefit of the doubt, the result still doesn't change. If the amendment took effect on January 1, 2019, then Plaintiff had until June 29, 2019—180 days after December 31, 2018—to file her EEOC charge. In that scenario, Plaintiff still filed her Charge of Discrimination 142 days late.

[15] Because the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's remaining Title VII claim on procedural grounds, it finds no need to address the Defendant's substantive arguments relating to single and mixed motive of sex discrimination surrounding its decision to pay Plaintiff different from her colleague with substantially more experience and an unblemished provider record.